IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GORDANA SCHIFANELLI, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. GLR-20-2906 |
| QUEEN ANNE'S COUNTY BOARD OF COMMISSIONERS, | : | |
| | : | |
| Defendant. | | |

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Queen Anne's County Board of Commissioners (the "County Board" or "Board") Motion to Dismiss (ECF No. 8) and Defendant Michael Clark's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 10). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the Motions.

### I.   BACKGROUND[1]

Plaintiff Gordana Schifanelli is a resident of Queen Anne's County, Maryland (the "County") and the parent of children who attend or attended public schools in the County. (Am. Compl. ¶ 8, ECF No. 6). On June 5, 2020, the Superintendent of Queen Anne's County Public Schools, Dr. Andrea Kane, sent a "politically charged email communication"—which called for "defunding of police," among other things—to the

---

[1] Unless otherwise noted, the Court takes the following facts from Plaintiff Gordana Schifanelli's Amended Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

parents of public-school students using the Queen Anne's County Public Schools notification system. (Id. ¶ 10). According to Schifanelli, this "controversial" email was sent during school hours and before the end of the scheduled school year. (Id.). Later, "at a Board of Education meeting," Superintendent Kane "commended a County high school student for organizing and carrying out a political protest in the County, at a time when such protests had already turned violent in other parts of the country, and while the State and students were in a quarantine due to COVID-19." (Id.).

According to Schifanelli, Maryland law prohibits County employees "from engaging in political activism during working hours." (Id.). Schifanelli and other parents thus considered Superintendent Kane's conduct "in advocating for a political organization and activism" to be "an abuse of County School resources and [of] her position." (Id. ¶ 11). However, when these parents "attempted to comment on the school internet platform, their posts were immediately deleted." (Id.). As a result, "several parents made posts on local social media platforms." (Id.). Schifanelli also contacted the County Board and members of the Queen Anne's County Board of Education about Superintendent Kane's conduct, but "representatives of each entity stated that they had no jurisdiction or control over Kane's actions." (Id. ¶ 12).

As a result of "[t]he inability of County parents to voice their concerns using existing social media platforms" and "the County's unwillingness to address Kane's actions," Schifanelli felt prompted to create a private Facebook group called "Kent Island Patriots." (Id. ¶ 13). According to Schifanelli, "Kent Island Patriots" was intended to be "a space where local parents and others could discuss Kane's recent behavior without being

2

subjected to written abuse, retaliation and censorship." (Id.). Superintendent Kane and Queen Anne's County Public Schools "were frequent topics of discussion among the Facebook group members, as were other political issues and viewpoints." (Id.).

Schifanelli alleges that the "Kent Island Patriots" Facebook group "caused alarm among those who supported Kane's political activism," including Matthew Evans, an administrator within the County Board of Education; Christine Betley, a County employee and school teacher; and Defendant Michael R. Clark, director of the County's Local Management Board. (Id. ¶ 14). According to Schifanelli, the Local Management Board is "an official office of the County government" that falls "under the [a]dministration of the [County] Board of Commissioners." (Id. ¶ 2). Clark, Evans, and Betley "were members of an officially organized, funded and administered sub-committee of the County Local Management Board" called the "Sunday Supper Committee" (the "Committee"). (Id. ¶ 14).

On July 24, 2020, the Committee convened a virtual meeting. (Id. ¶ 15). Defendant Clark was present at the meeting in his capacity as Director of the Local Management Board. (Id.). According to the written minutes of the meeting, Clark and other members of the Committee were "conducting a petition-signing campaign to show support of School Superintendent Kane" because, according to Schifanelli, "there was fear among [Kane's] supporters that Schifanelli's speech was putting Kane's employment in jeopardy." (Id. ¶ 16). The meeting minutes also reflect that "Committee members and agents, including Defendant Clark, discussed Schifanelli" and "identified Schifanelli as the 'leader' of the 'Kent Island Patriots' Facebook group." (Id. ¶ 17). Additionally, "Clark and the others discussed Schifanelli's employment, identified her employer, and urged Committee

3

members to contact Schifanelli's employer regarding her criticism of Superintendent Kane[,] which they considered 'inflammatory.'" (Id.). Further, "[t]he Committee noted that '[i]f anyone needs screenshots of inflammatory remarks/misinformation, or additional information about the situation,' they should 'contact Christine [Betley] or Mary Ella [Jourdak].'" (Id.). The meeting minutes also included "detailed contact information for Schifanelli's university employer" so that members could "send the alleged 'inflammatory remarks/misinformation.'" (Id.). Schifanelli believes "the Committee's intent was to silence [her] and/or retaliate against her for having criticized Dr. Kane, by creating a threat to her livelihood or causing her employment termination." (Id. ¶ 18).

Schifanelli alleges that, after this meeting, "members of the County Committee and/or other persons . . . waged a sustained campaign of defamation and harassment against Schifanelli by contacting her employer and college alumni by telephone, Facebook posts, Tweets and presumably other means" to "falsely accus[e] her of being a racist, of inciting violence, of conducting a 'smear campaign' against Superintendent Kane, and of being a liar." (Id ¶ 19). Schifanelli asserts that these individuals did so "[w]ith the consent and acquiescence of, direction of, or participation by Defendant Clark." (Id.). According to Schifanelli, "[a]t least one volunteer member of the Local Management Board Committee made similar false and accusatory posts on the Maryland Bar Association's Facebook Page" and "organized a campaign to file multiple official Bar Complaints with the Maryland Bar Association's Grievance Commission." (Id.). Additionally, "members of the Committee spread false accusations on various other social media pages, including accusing Schifanelli of being a racist and white supremacist." (Id.). Schifanelli has also

4

"received calls by persons who have threatened to 'demonstrate' against her 'racism' in front of her home and her office." (Id.). Further, "[a] 'friend' of the same Committee member made threats of vandalizing Schifanelli's home and 'making her life miserable.'" (Id.). Schifanelli asserts that "[o]ther members of the community have perpetuated these falsehoods created during the Committee's campaign." (Id.). According to Schifanelli, after "Committee members or those encouraged by the Committee members[ ] complained about [her] to Facebook," "Schifanelli's law practice Facebook page," "private Facebook page," and "her access to the [Kent Island Patriots] Facebook group" were "permanently suspended by Facebook" in October 2020. (Id.). Finally, Schifanelli alleges that "[s]he has since received death threats." (Id.).

On July 29, 2020, "after having been alerted by her employer that [it] had received defamatory communications from Committee members, including texts, Facebook posts, telephone calls, etc.," Schifanelli sent a "written demand" to Defendant Clark and "a known member/agent of his Committee, Mary Ella Jourdak," requesting that they "cease and desist" sending any further communications to Schifanelli's employer. (Id. ¶ 20). Schifanelli did not receive a response. (Id.). According to Schifanelli, however, "the Committee member/agent continued contacting not only Schifanelli's employer, but also the Maryland Attorney General's office, accusing Schifanelli of the various aforementioned falsehoods." (Id.).

On or about August 3, 2020, Schifanelli sent a notice to the County Board "alerting them to the past and ongoing actions of [the] Local Management Board Director and [its]

5

agents/members . . . and of the possibility of bringing suit against the County for various tort claims including defamation." (Id. ¶ 21).

Schifanelli alleges that, "as a direct and proximate result of Defendant Clark's actions and acquiescence" and "Defendants' conspiring and actions against her," she has suffered "damage to her reputation as an attorney," "professor," and "resident of Queen Anne's County"; "severe emotional distress"; "loss of income as an attorney"; and "dignitary damages for having been retaliated against and deprived of her First Amendment Right to free speech, including having been silenced on Facebook." (Id. ¶ 22).

Schifanelli filed suit against the County Board, Clark, Evans, and Betley on October 8, 2020. (ECF No. 1). On November 9, 2020, Schifanelli filed an Amended Complaint, which dropped Evans and Betley as Defendants. (ECF No. 6). Schifanelli's seven-count Amended Complaint alleges: conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) against Clark in his individual and official capacities (Counts One & Two); as well as violation of the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983 (Count Three); false light (Count Four); defamation (Count Five); defamation per se (Counts Six & Seven) against the County Board. (Am. Compl. ¶¶ 23–51). Schifanelli seeks compensatory and punitive damages. (See id. at 9–17).

The Board moved for dismissal of the Amended Complaint on November 23, 2020. (ECF No. 8). Schifanelli filed her Opposition on December 3, 2020. (ECF No. 9). On December 16, 2020, Clark filed his Motion to Dismiss Plaintiff's Amended Complaint. (ECF No. 10). The following day, the Board filed a Reply in support of its Motion along

with a notice indicating that it was adopting and incorporating by reference the arguments raised in Clark's Motion. (ECF Nos. 11, 12). On January 11, 2021, Schifanelli filed an Opposition to Clark's Motion. (ECF No. 14). The same day, Schifanelli voluntarily dismissed Clark from suit without prejudice. (ECF Nos. 13, 15).[2]

## II.   DISCUSSION

### A.   Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must

---

[2] Although Schifanelli voluntarily dismissed Clark from suit prior to the Court's disposition of his Motion, the Court will nonetheless assess the claims against him to determine whether they should be dismissed with prejudice. Additionally, the Court will consider any allegations about Clark's conduct to the extent they are necessary to evaluate Schifanelli's claims against the Board.

allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**B.     Analysis**

The County Board and Clark move for dismissal of Counts One through Seven of Plaintiffs' Amended Complaint. The Court addresses each claim in turn.

**1.     42 U.S.C. § 1985 Claims (Counts One & Two)**

In Counts One and Two of her Amended Complaint, Schifanelli alleges violations of 42 U.S.C. § 1985(3) against Defendant Clark in his individual and official capacities. To state a claim under § 1985, the plaintiff must allege:

> (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

8

Unus v. Kane, 565 F.3d 103, 126 (4th Cir. 2009) (quoting Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)).

Here, Schifanelli concedes that she is unable "in good faith show that any defendant was motivated to act, or failed to act, because of her sex, gender, race, national origin or other protected ground." (Pl.'s Opp'n Cnty. Bd.'s Mot. Dismiss ["Opp'n"] at 2, ECF No. 9). Accordingly, the Court will dismiss Counts One and Two with prejudice.

### 2. Section 1983 Claim (Count Three)

In Count Three of her Amended Complaint, Schifanelli brings a claim against the County pursuant to 42 U.S.C. § 1983 for violation of her rights under the First and Fourteenth Amendments. Under § 1983, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978). Rather, liability under § 1983 for a municipality "results only when [a] policy or custom . . . is (1) fairly attributable to the municipality as its own and is (2) the moving force behind the particular constitutional violation." Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal quotation marks and citations omitted). In other words, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation" of constitutional rights. Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994).

Although municipal liability under § 1983 attaches only to "action [taken] pursuant to official municipal policy of some nature," Pembaur v. City of Cincinnati, 475 U.S. 469,

9

477 (1986) (quoting Monell, 436 U.S. at 691), "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," Pembaur, 475 U.S. at 480. Indeed, "governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances" so long as that governmental unit possessed "final authority to create official policy." Semple v. City of Moundsville, 195 F.3d 708, 712 (4th Cir. 1999) (citing Pembaur, 475 U.S. at 481). "If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." Pembaur, 475 U.S. at 477. Accordingly, in assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Liverman v. City of Petersburg, 844 F.3d 400, 413 (4th Cir. 2016) (quoting Pembaur, 475 U.S. at 481). If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy. See Pembaur, 475 U.S. at 481.

Separately, "[m]unicipal policy may be found . . . in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (citing City of Canton v. Harris, 489 U.S. 378, 388–89 (1989)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). Further, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate

indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Id. at 411. However, a policy or custom that gives rise to § 1983 liability will not "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." Milligan v. City of Newport News, 743 F.2d 227, 230 (4th Cir. 1984) (citations omitted).

Here, Schifanelli does not posit that the alleged deprivation of her rights was the result of a formal policy statement, ordinance, regulation, or other decision adopted by the Board. Rather, Schifanelli argues that Clark "approved" the deprivation of her First Amendment rights through his "presence" and "acquiescence" during the July 24, 2020 meeting. (See Opp'n at 9). Schifanelli further alleges that Clark, as an "Executive Director" of the Local Management Board, "was an officer with final policy-making authority." (Id.). In other words, Schifanelli's § 1983 claim is premised on Clark's failure to act during and after the July 24, 2020 meeting, the consequence of which can be attributed to the County Board because of Clark's policy-making authority.

This claim fails for two reasons. First, to the extent Schifanelli attempts to proceed under the theory that Clark's "acquiescence" caused her constitutional deprivation, she has not alleged that Clark failed "to put a stop to or correct a widespread pattern of unconstitutional conduct" by municipal officials. Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 402 (4th Cir. 2014) (quoting Spell, 824 F.2d at 1387); see also Saltz v. City of Frederick, No. ELH-20-0831, --- F.Supp.3d ---, 2021 WL 1856636, at *31 (D.Md. May 10, 2021) (holding that plaintiff could not proceed on a theory that defendant city "condoned" the unconstitutional acts because the conduct was "sporadic" and "isolated,"

11

not "persistent," "widespread," and "flagrant" (citing Owens, 767 F.3d at 403)). And second, even if Schifanelli stated a § 1983 claim based on Clark's omission or failure to act, she has not alleged that Clark's inaction is fairly attributable to the Board. Aside from Schifanelli's bare-bones assertion that Clark has authority to establish municipal policy, the Amended Complaint is devoid of any facts suggesting this to be the case. Rather, it is utterly unclear whether Clark, as a Committee member and director of the Local Management Board—which is "under the [a]dministration of the [County] Board of Commissioners," (Am. Compl. ¶ 2)—has any final decision-making authority as to the County Board. For these reasons, Count Three will be dismissed.

### 3.  State Law Claims (Counts Four–Seven)

In Counts Four through Seven of her Amended Complaint, Schifanelli alleges various state tort claims against the County Board. For the reasons explained below, these claims will be dismissed.

#### a.  Government Immunity

The County Board argues that it is immune from suit under the Maryland Local Government Torts Claims Act ("LGTCA"), Md. Code Ann., Cts. & Jud. Proc. § 5-301 et seq., which applies to claims against Maryland counties and their employees.[3] The LGCTA governs suits alleging "damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government." Id. § 5-302(a).

---

[3] The Board argues that it is entitled to immunity from Schifanelli's state tort claims under the LGTCA because the Local Management Board serves a governmental, rather than a private or proprietary, function. Because the Court will dismiss Scifanelli's state tort claims for other reasons, the Court need not address this argument.

Through enacting the LGTCA, the Maryland General Assembly "partially waived the traditional governmental immunity enjoyed by local governments." Martino v. Bell, 40 F.Supp.2d 719, 722 (D.Md. 1999). "The LGTCA requires local governments to defend actions brought against their employees, and in certain circumstances, requires successful plaintiffs to execute judgments against the local government rather than the employee." Id. (citing Pavelka v. Carter, 996 F.2d 645, 649 (4th Cir. 1993)).

Critically, although the LGTCA waives a local government's immunity for common law tort liability, it does not create liability on the part of the local government—rather, it simply makes the local government financially responsible for certain judgments against its employees. See Dawson v. Prince George's Cnty., 896 F.Supp. 537, 539 (D.Md. 1995). Accordingly, the LGTCA does not permit a plaintiff to proceed against only the local government in a common law tort suit. Martino, 40 F.Supp.2d at 723 ("The LGTCA does not, however, allow [plaintiffs] to name Howard County directly in a common law tort suit." (citing Dawson, 896 F.Supp. at 539)).

Here, Schifanelli brings her state tort claims against the County Board only. However, Schifanelli cannot sue the Board directly under the LGTCA; instead, she must establish liability on the part of a County employee, then seek to execute that judgment against the County. Although Schifanelli repeatedly states that the "County's" or "the Board's defamatory actions" caused her reputational harm, (see, e.g., Am. Compl. ¶¶ 45, 49), she also occasionally suggests that her reputational harm was the "direct and proximate result of Defendant Clark's actions and acquiescence." (Id. ¶ 22). Thus, the Court presumes that Schifanelli's claims against the Board are premised on the tortious acts or omissions

of Defendant Clark. Accordingly, the Court will evaluate whether Schifanelli states a claim against Defendant Clark.

### b. Reputational Torts

In Counts Four through Seven of her Amended Complaint, Schifanelli asserts claims for defamation, false light, and defamation per se. This Court has set forth the following standard for defamation claims:

> Under Maryland law, to establish a prima facie case of defamation, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm.

Doe v. Johns Hopkins Health Sys. Corp., 274 F.Supp.3d 355, 365 (D.Md. 2017). Defamation and defamation per se comprise the same four elements, with the exception that the fourth element, harm, may be presumed where a statement is defamatory per se. Id. at 365–66; see also Piscatelli v. Van Smith, 35 A.3d 1140, 1146–47 (Md. 2012) ("An allegation of false light must meet the same legal standards as an allegation of defamation." (citations omitted)). Thus, each of these claims requires Schifanelli to plead, among other things, "publication"—i.e., that Clark made a defamatory statement to a third person—and "falsity"—i.e., that the statement was false. The Court considers these elements in turn.

### i. Publication

To adequately allege her reputational torts, Schifanelli must first plead the threshold requirement of "publication." See Mejia v. Telemundo Mid-Atl. LLC, 440 F.Supp.3d 495, 499 (D.Md. 2020). Publication requires that "the defendant made a defamatory statement

14

to a third person." Id. (emphasis added). In other words, Schifanelli must allege that Clark made the allegedly defamatory statements at issue. See Harvey v. Cable News Network, Inc., No. RDB-20-3068, --- F.Supp.3d ---, 2021 WL 615138, at *9 (D.Md. Feb. 17, 2021) (dismissing defamation claims where plaintiff alleged that an entity other than defendant published the statements at issue).

Even reading the Amended Complaint generously, Schifanelli's allegations against Clark are sparse. First, Schifanelli alleges that "Committee members and agents, including Defendant Clark" discussed Schifanelli, her employment, and her remarks about Superintendent Kane during a July 24, 2020 virtual Committee meeting. (Am. Compl. ¶¶ 15–17). Schifanelli also alleges that "members of the County Committee and/or other persons . . . waged a sustain campaign of defamation and harassment against" Schifanelli "[w]ith the consent and acquiescence of, direction of, or participation by Defendant Clark." (Id. ¶ 19). Finally, Schifanelli alleges that she sent a "written demand" to Clark and another committee member on July 29, 2020 requesting that they "'cease and desist' sending any further communications to her employer." (Id. ¶ 20). As for the remainder of Schifanelli's allegations—in particular, that one or more individuals published "false and accusatory posts [about Schifanelli] on the Maryland Bar Association's Facebook Page"; "organized a campaign to file multiple official Bar Complaints with the Maryland Bar Association's Grievance Commission"; "spread false accusations on various other social media pages, including accusing Schifanelli of being a racist and white supremacist"; threatened to "demonstrate" in front of her home and office, "vandalize [her] home," and "mak[e] her

15

life miserable; and made "death threats" against her—these allegations are not directed at Clark. (See id. ¶ 19).

At bottom, Schifanelli's Amended Complaint does not adequately allege the element of publication. The assertion that Clark was present at a meeting during which Schifanelli was a topic of discussion is hardly enough to give rise to a reasonable inference that Clark later made a defamatory statement about Schifanelli to a third party. Moreover, Schifanelli's allegations that the "campaign of defamation" resulted from Clark's "consent," "acquiescence," "direction," or "participation," (see id.), are conclusory and, without more, cannot proceed. For these reasons, Schifanelli fails to adequately allege the first element of her reputational tort claims.

### ii.  Falsity

To prevail on her reputation tort claims, Schifanelli must plead and prove "the falsity of a particular statement." See Spengler v. Sears, Roebuck & Co., 878 A.2d 628, 640 (Md. 2005) (citation omitted). "A false statement is one that is not substantially correct." Batson v. Shiflett, 602 A.2d 1191, 1212 (Md. 1992) (citation omitted). Additionally, "the burden of proving falsity rests upon the plaintiff[.]" Jacron Sales Co., Inc. v. Sindorf, 350 A.2d 688, 698 (Md. 1976). Indeed, if a plaintiff cannot prove the falsity of a particular statement, the statement will not support an action for defamation. See Bagwell v. Peninsula Reg'l Med. Ctr., 665 A.2d 297, 317 (Md.Ct.Spec.App. 1995).

Here, the crux of Schifanelli's claims is that Clark and others "waged a sustained campaign of defamation and harassment against [her] by . . . falsely accusing her of being a racist, of inciting violence, of conducting a 'smear campaign' against Superintendent

16

Kane, and of being a liar." (Am. Compl. ¶ 19). Importantly, though, one's personal belief that another is a "racist" or "liar" who is guilty of "inciting violence" or engaging in a "smear campaign" is fairly construed as statement of opinion that is incapable of being proven true of false. See McReady v. O'Malley, 804 F.Supp.2d 427, 442 (D.Md. 2011) (finding that comments that plaintiff was an "angry workplace guy" who was "rapid with bitterness" and was "demanding," "disrespectful," and "abusive" were statements of opinion); see also Smith v. Griffiths, No. 3119, Sept. 2018 Term, 2020 WL 5413672, at *10 (Md.Ct.Spec.App. Sept. 9, 2020) ("In determining whether a published statement is fact or opinion, the relevant test is whether 'an ordinary person, reading the matter complained of, [would] be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact[.]'" (quoting A. S. Abell Co. v. Kirby, 176 A.2d 340, 343 (Md. 1961))).

This is not to say that opinions cannot be defamatory—indeed, statements of opinion can be just as damaging as statements of fact. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 19 (1990) ("[T]he statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'"). Thus, "an opinion may constitute actionable defamation, but only if the opinion can be reasonably interpreted to declare or imply untrue facts." Biospherics, Inc. v. Forbes, Inc., 151 F.3d 180, 184 (4th Cir. 1998) (citing Milkovich, 497 U.S. at 20). In other words, "a statement is not actionable unless it asserts a provably false fact or factual connotation." Agora, Inc. v. Axxess, Inc., 90 F.Supp.2d 697, 702 (D.Md. 2000) (citations omitted). By contrast, "[i]f the facts from which a defendant forms his or her opinion are given or are readily available and those

17

facts cannot be proved false, the defendant is not subject to liability for the opinion." Peroutka v. Streng, 695 A.2d 1287, 1297 (Md.Ct.Spec.App. 1997) (citation omitted).

In drawing a line between statements of fact and opinion, the Court must look to "the verifiability of the statement and examine[ ] the statement's language to determine if it may be interpreted as asserting a fact." Agora, 90 F.Supp.2d at 702 (citations omitted). Thus, the Court's task is to examine "the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment . . . protect." Id. (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 284–85 (1964)). "The burden, therefore, is on [the plaintiff] to allege facts which, if proved, would establish, as a threshold matter, the falsity of the alleged defamatory statements that were published by [the defendant]." Id. (citations omitted).

Schifanelli alleges that she started the Kent Island Patriots Facebook group "to create a space where local parents and others could discuss Kane's recent behavior without being subjected to written abuse, retaliation and censorship." (Am. Compl. ¶ 13). According to Schifanelli, this "caused alarm among those who supported Kane's political activism," including Defendant Clark. (Id. ¶ 14). Clark and others then "identified Schifanelli as the 'leader' of the 'Kent Island Patriots' Facebook group" and discussed Schifanelli's "criticism of Superintendent Kane[,] which they considered [to be] 'inflammatory.'" (Id. ¶ 17). Thus, it appears that Clark and others drew their conclusions that Schifanelli was a "racist" and "liar" who "incit[ed] violence" and engaged in "smear campaigns" based upon their review of what they deemed to be "inflammatory

18

remarks/misinformation" about Superintendent Kane that Schifanelli posted in the Kent Island Patriots group. (See id. ¶¶ 13, 17).

Of course, the Court is not tasked with determining the accuracy of these opinions, but instead must determine "whether the facts upon which [the] opinions were based were true." Griffiths, 2020 WL 5413672, at *8. The Court cannot do so, however, without the context of the defamatory statements themselves or some reference to the facts on which the defamatory statements were based. Here, however, Schifanelli does not provide the full context of the purported defamatory statements, nor does she provide any context for her posts in the Kent Island Patriots group that Clark and others deemed to be "inflammatory." Without this context, the Court is unable to plausibly infer that the alleged defamatory statements implied a provably false fact or factual connotation. See Agora, 90 F.Supp.2d at 702. Accordingly, Schifanelli has not met her burden at the pleading stage.

Further, to the extent Schifanelli alleges that Clark defamed her by sending "screenshots of [Schifanelli's] inflammatory remarks/misinformation" to her employer, these claims also fail. "Generally, a plaintiff can not [sic] be defamed by the use of his own words." Smith v. Sch. Dist. of Phila., 112 F.Supp.2d 417, 429–30 (E.D.Pa. 2000) (explaining that use of a letter plaintiff voluntarily wrote is not defamatory because it was the plaintiff's own words); see also Johnson v. Overnite Transp. Co., 19 F.3d 392, 392 n.1 (8th Cir. 1994) (noting as a general rule that "a defamation claim arises only from a communication by someone other than the person defamed"). And while it is true that deliberate alteration of a person's words that results "in a material change in the meaning conveyed by the statement" can establish the element of falsity, see Masson v. New Yorker

Mag., Inc., 501 U.S. 496, 517 (1991), Schifanelli has not made any allegations to that effect. For this reason, Schifanelli has not adequately pleaded the element of falsity for her reputational tort claims.

In sum, Schifanelli does not adequately allege that Clark made a defamatory statement to a third party and that the statement was false. Thus, Schifanelli has failed to set forth allegations that would allow the Court to draw the reasonable inference that Clark is liable for the reputational torts she alleges. See Iqbal, 556 U.S. at 678; Fed.R.Civ.P. 8(a). Because Schifanelli has failed to state claims against Clark for defamation, false light, and defamation per se, the LGTCA prevents these claims from proceeding against the County Board. See Martino, 40 F.Supp.2d at 723. Accordingly, Counts Four through Seven will be dismissed.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant the Motions to Dismiss by the County Board and Clark (ECF Nos. 8, 10). A separate Order follows.

Entered this 18th day of August, 2021.

_____/s/_____<br>
George L. Russell, III<br>
United States District Judge